1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9 KELLY ANN WORDEN,                    CASE NO. 1:09-cv-00868-SMS

10                          Plaintiff,

                                       ORDER AFFIRMING AGENCY'S
11        v.                           DENIAL OF BENEFITS

12 MICHAEL ASTRUE,
   Commissioner of Social Security,
13
                           Defendant.
14 _____/

15

16       Plaintiff Kelly Ann Worden, proceeding *in forma pauperis*, by her attorney, Robert E.

17 Lowenstein, Jr., A Professional Corporation, seeks judicial review of a final decision of the

   Commissioner of Social Security ("Commissioner") denying her application for supplemental
18
   security income  ("SSI"), pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et*
19
   *seq.)* (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which
20
   were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States
21
   Magistrate Judge.[1]  Following a review of the complete record and applicable law, this Court
22
   concludes that the ALJ properly found Plaintiff ineligible for benefits.
23
   **I.    Administrative Record**
24
        **A.    Procedural History**
25
        On May 18, 2005, Plaintiff filed for supplementary security income, alleging disability
26
   beginning February 25, 2005.  AR 22.  Her claim was initially denied on November 7, 2005, and
27

28
   _____
       [1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 6 & 9).

upon reconsideration, on February 13, 2007.  AR 22.  On March 14, 2007, Plaintiff filed a timely request for a hearing.  AR 22.   Plaintiff appeared and testified at a hearing on September 20, 2007.  AR 882-899. On October 24, 2007, Administrative Law Judge Edward C. Graham denied Plaintiff's application.  AR 22-30.  The Appeals Council denied review on March 13, 2009.  AR 5-8.  On May 9, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

### B.    Factual Background[2]

Plaintiff (born April 9, 1966) initially attributed her inability to work to (1) her felony conviction; (2) her inability to stretch to put dishes on the top shelf, which hurt her back; (3) frequent head jerks; and (4) shaking hands.  AR 96.   She was five feet, six inches tall, and weighed 211 pounds.  AR 95.  Plaintiff first noticed her inability to work on February 25, 2005. AR 96.  She had worked briefly as a telemarketer and a merchandise control clerk, but was most recently employed as a home care worker.  AR 88.  Plaintiff is a high school graduate with a year of college.  AR 196.

### 1.    Physical Ailments (Back Pain and Head Tremor)

At an appointment on February 11, 2005, Plaintiff complained of lower back pain to Albert Encina, M.D.  AR 180.

Plaintiff was treated in the emergency room at Tehachapi Valley Healthcare District for acute low back pain on February 25, 2005.  AR 200-217.  Plaintiff was stricken with sharp pain when she bent over at home.  AR 203.  Upon arrival, Plaintiff complained of pain with any movement.  AR 205.  Medical personnel administered Demerol[3] and Phenergan.[4]  AR 205.  Three

///

---

[2] The record includes multiple copies of many documents.  This Court cites only the first copy of any document of which multiple copies were provided.
   In addition, documents and reports regarding multiple unrelated ailments, including breast pain, facial wart removal, gynecological issues, digestive problems, and testing for various unrelated conditions, which appear in the record, have been omitted as irrelevant to this appeal.

[3] Demerol (meperidine) is a narcotic analgesic used to relieve moderate to severe pain. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000583 (November 4, 2010).

[4] Phenergan (promethazine hydrochloride) is used to relieve the symptoms of allergic reactions. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000637 (November 4, 2010).

hours later, Plaintiff's pain had decreased, and she was able to move on her own.  AR 205.  Spinal x-rays were unremarkable, except for revealing limbus vertebrae at S1-S2.[5]  AR 648.

On February 27, 2005, Plaintiff appeared at High Desert Hospital's urgent care facility complaining of lower back and upper rib pain.  AR 272.  She reported that the vicodin[6] was making her sick.  AR 272.

Richard Elton, M.D., of the orthopedic clinic at High Desert Health System, examined Plaintiff and took x-rays on March 9, 2005.  AR 271.  Plaintiff reported that, on the evening of February 24, 2005, she experienced low back pain.  AR 271.  The following morning she woke and went from the bedroom to the kitchen where she felt crushing pain in the middle of her back.  AR 271.  She experienced shortness of breath and felt her ribs crunching.  AR 271.  Plaintiff reported that her anterior thighs had been numb for two days prior to the incident, and that her lower back and the base of her neck swelled and hurt.  AR 271.  After examining Plaintiff's x-rays, Elton saw only an abnormality (accessory ossification, i.e., limbus vertebrae) that he considered developmental.  AR 271.  Similarly, radiologist Hrayr A. Kabakian, M.D., opined that Plaintiff's cervical and thoracic spine were normal.  AR 294.  Regarding Plaintiff's lumbar spine, Kabakian opined:

> A fracture is not identified.  There is an ununite [*sic*] secondary ossification center of L4 body at its anterosuperior corner.  This is of no clinical significance.  The vertebrae are otherwise, normal.  The disc spaces and the sacroiliac articulations are normal.

AR 294.

Elton again saw Plaintiff on March 30, 2005.  AR 269.  She was slightly better but still experienced lower back pain when she reached, as when putting dishes away.  AR 269.  Elton opined that the "lesion" spotted on Plaintiff's x-ray was developmental and "normal."  AR 269.  He concluded, "I really can't explain her symptoms."  AR 269.

---

[5]  A limbus vertebra is a defect in the vertebra during the process of formation, generally attributable to trauma.  A common finding, it requires no further investigation and, at most, very conservative treatment.  Misdiagnosis as a fracture can lead to unnecessary invasive procedures.  *See* www.dynamicchiropractic.com/mpacms/dc/article.php?id=36091 (November 3, 2010).

[6]  Vicodin (acetaminophen and hydrocodone) is a narcotic pain reliever.  www.drugs.com/vicodin.html (November 4, 2010).

On April 21, 2005, Plaintiff told Encina that she had fractured a vertebra (she was not sure which one) two months earlier while helping someone move.  AR 178.  Encina ordered a spinal x-ray.  AR 178.  Ronald McGrady, M.D., of Lancaster Imaging analyzed the five x-ray views of Plaintiff's lumbar spine and found:

> Transitional lumbar anatomy is present.  No lytic or blastic lesions or acute fractures are demonstrated.  Unilateral sacralization of the lower lumbar vertebral body on the left side is present.  There is an abnormality involving the superior aspect of what appears to represent L4, either of a congenital nature or related to prior trauma.

AR 221.

On July 28, 2005, Plaintiff complained to Encina of a head tremor, but he was unable to observe it.  AR 171.  On August 5, 2005, Encina diagnosed Plaintiff's head tremor.  AR 170.

Thu-Anh Hoang, M.D., summarized the results of magnetic resonance imaging of Plaintiff's lumbar spine on August 4, 2005:

> The bone marrow signal is normal.  There is no evidence of compression fracture or bony lesion.  The conus medullaris and cauda equina are unremarkable.
>
> The degenerated L3-4 disk is desiccated.  There is no evidence of disk bulge or protrusion at T12-L1, L1-2, L2-3, L3-4, L4-5, or L5-S1.  The thecal sac remains normal despite variable degrees of mild to moderate degenerative hypertrophic facet disease (as one progresses from upper to the lower lumbar spine) and mild thickening of the ligamentum flavum.  No evidence of nerve root compression in the neural foramina in any levels.

AR 157 (*emphasis added*[7]).

Accordingly, Hoang's impression was:

> No evidence of compression fracture of the lumbar vertebrae.  No evidence of disk bulge, protrusion, significant spinal stenosis, nerve root compression in neural foramina at any levels.  No evidence of spondylolisthesis or spondylolysis..

AR 157.

On August 12, 2005, Gurprem Kang, M.D., analyzed x-rays of Plaintiff's cervical spine.  AR 231.  He found:

> Mild degenerative changes of the cervical spine are seen with small osteophyte formations between C4 and C7.  Mild posterior osteophyte formations are also

---

[7]  Plaintiff, attaching this document to her disability report for the appeal, highlighted the emphasized language and hand wrote: "DOCTORS HAVE CHOSEN TO IGNORE."  AR 157.  Apparently, Plaintiff's limbus vertebra appeared on the MRI as a desiccated disc.

seen between C5 and C7.  No evidence of recent fracture, compression or subluxation.  Lordotoc curvature is decreased.  No prevertebral soft tissue swelling.

AR 231.

On August 25, 2005, Encina noted that Plaintiff's low back pain continued and diagnosed back strain.  AR 168.  He also noted that Inderol[8] was not helping the head tremor.  AR 168.

After analyzing a CT scan of Plaintiff's spine on September 14, 2005, Kang reported:

There is no evidence of posterior herniation or significant posterior bulging of any of the lumbar intervertebral disks between L1 and S1.  There is no evidence of extrinsic pressure on the thecal sac.  There is no evidence of significant encroachment of the neural foramina.  Very minimal degenerative changes of the facet joints is seen.  Small to modest anterior osteophyte formation is seen from the body of L4 vertebra.

AR 159.

Kang also analyzed a CT scan of Plaintiff's head and found that it appeared normal.  AR 229.

On September 16, 2005, Plaintiff saw Jong S. Lee, M.D., an ambulatory care doctor at High Desert Hospital, complaining of head tremor and lower back pain.[9]  AR 262.  Lee ordered MRI and CT scans.  AR 262.  On October 3, 2005, Plaintiff again complained to Lee of lower back pain.  AR 261.

On November 8, 2005, Plaintiff saw Sri to discuss her primidone prescription, which was not helping her head tremors.  AR 256.

On November 30, 2005, neurologist L. Janumpally, M.D., evaluated Plaintiff's head tremor.  AR 251.  He found no evidence of Parkinsonism.  AR 251.  A CT scan of her head was unremarkable.  AR 251.  Accordingly, Janumpally recommended that Plaintiff continue to take mysoline.[10]  AR 251.

---

[8]  Inderol (propanolol oral) is used to treat high blood pressure, abnormal heart rhythms, heart disease, certain tumors, and certain types of tremor, and to prevent angina and migraine headaches. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000727 (November 4, 2010).

[9]  A nurse's note, dated September 15, 2005, regarding Encina's referral of Plaintiff to Lee, is illegible.  AR 263.

[10]  Mysoline (primidone), an anticonvulsant, is used alone or with other medications to prevent seizures. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000550 (November 4, 2010).

1      Plaintiff saw Sri on January 13, 2006, to discuss mysoline, her severe head tremors, sharp

2 shooting pain, and fatigue.  AR 253.  On January 24, 2006, Plaintiff complained to Sri of pain in

3 the back of her head and her ears.  AR 252.

4      On February 10, 2006, Plaintiff saw Janumpally, reporting subjective symptoms.  AR 318.

5 Noting no change on the CT scan of Plaintiff's head, Janumpally reported that the mysolin was

6 not helping Plaintiff's "cerebellar tremor" and that inderol could not be given since the tremor

7 caused headache and fever.  AR 318.  On October 5, 2006, Janumpally ordered MRI of Plaintiff's

8 spine, noting that Plaintiff wanted "disability."  AR 317.

9      Mark Beller, M.D., provided a report of an October 20, 2006, lumbar spine MRI.  AR 790-

10 791.  He reported bilateral facet arthropathy at L4-L5; limbus vertebra at L3; and multilevel mild

11 discogenic disease.  AR 790.  Generally, the various examined portions of Plaintiff's spine were

12 "normal" and "patent."  AR 790-791.

13      On February 5, 13, and 20, 2007, a doctor (signature illegible[11]) at Cal City Hospital

14 recommended physical therapy for Plaintiff's lower back pain.  AR 745, 746, 747.  On April 2 and

15 20, 2007, a doctor diagnosed Plaintiff's head tremor as benign essential tremor.[12]  AR 741.  On

16 May 26, 2007, Plaintiff saw a doctor for chronic back pain.  AR 735.  She declined treatment by

17 injection.  AR 735.  On March 19, 2008, Plaintiff saw a doctor when four days of lower back pain

18 occurred after lifting.  AR 849.

19      Between December 18, 2006, and April 13, 2007, Plaintiff received physical therapy for

20 lower back pain at West Point Physical Therapy Center.  AR 779-785.  On December 18, 2006,

21 Plaintiff's pain was rated four on a scale of one to ten.  AR 785.  Therapy included hot and cold

22 treatments and work on walking, sitting, standing, and lifting and carrying.  On April 13, 2007,

23 Plaintiff reported that her lower back was "feeling good."  AR 779-780.  Plaintiff's formal therapy

24 appointments were discontinued, and she was directed to perform her exercises at home.  AR 779.

25 The therapist's assessment was:

26

27      [11]  The handwritten notes from Cal City Clinic are generally illegible.

28      [12]  Benign essential tremor is harmless rhythmic shaking caused by a disorder of the nervous system.
www.mayoclinic.com/health/essential-tremor/DS00367 (November 22, 2010).

1  Chronic pain level has subsided.  Exhibits generalized [abdominal-lower back]
2  weakness and [lower back/middle back] tightness.  **No functional limitations.**
   Plateaued at this time.

3  AR 779 (*emphasis added*).

4      On August 8, 2007, radiologist Warren Becker, M.D., reviewed Plaintiff's x-rays and
5  found that, except for a limbic vertebra at L4, Plaintiff's spine was normal.  AR 761.  Her pelvis
6  and left and right hips were also normal.  AR 761.

7      Radiologist Javed Syed, M.D., analyzed an MRI of Plaintiff's lumbar spine on September
8  17, 2007.  AR 837-838.  He found, "Minimal degenerative changes in the lumbar spine with no
9  appreciable spinal stenosis, neural foramina narrowing, or disc herniation." AR 837.  He noted a
10 mild deformity on L4 and a deformity on the left of S1, which could not be fully evaluated with
11 the MRI.  AR 838.

12          **2.    Mental Ailments**

13     On October 31, 2005, Catherine Murray, an MFT intern, completed an assessment of
14 Plaintiff for Kern County Mental Health (KCMH).  AR 195-199).  Murray noted that Plaintiff was
15 then caring for five teenagers, her own two children,[13] and her boyfriend's three children.  AR
16 195.  Plaintiff complained of anger, anxiety, and frequent confusion.  AR 195. She felt depressed
17 and angry because she had always been dependent on her parents or a man, and had never been
18 independent.  AR 195.  She sought treatment to resolve mood swings.  AR 195.

19     Plaintiff reported no suicidal ideation since she stopped substance abuse.  AR 195.  She
20 reported that she was hospitalized in 1985 after supposedly attempting suicide but she insisted
21 that she had been pregnant and had simply acted impulsively under the influence of hormones
22 when her grandmother tried to drive away with her cat.  AR 195.  She had no urges to harm
23 others, although she acknowledged wanting to harm her ex-husband, who had molested her
24 children.  AR 198.  Among other matters of medical history, Plaintiff told Murray that she had
25 broken her L4 vertebra on February 28, 2005.  AR 196.

26 ///

27

28     [13]  Plaintiff has four children, born of unions with different men to whom she was not married.  AR 734.
   Various children lived with Plaintiff at various times covered by the record.

7

1    Plaintiff reported that she had no close friends, having let go of her old friends when she

2 became sober.  AR 196.  She related poor judgment with men.  AR 197.

3    Plaintiff's longest job had been caring for an elderly woman for seven years.  AR 197.

4 She reported doing volunteer work with her church, animal control, two girl scout troops, and her

5 son's young marine troop.  AR 197.  She was now living on government aid and paying the bills

6 only when the collectors called.  AR 197.  She had applied for social security disability because of

7 her broken vertebra and her head tremors.  AR 197.  Plaintiff had been convicted of burglary in

8 November 2003 after she stole checks from a neighbor who had died and used them to get money

9 for drugs.  AR 197.  Consequently, Plaintiff was on probation until 2007.  AR 197.

10    Plaintiff's speech was low, somewhat garbled, and difficult to understand.  AR 198.  She

11 displayed odd motor movements, possibly from her previous methamphetamine use.  AR 198.

12 Her insight, judgment and intellectual function appeared within normal limits.  AR 198.

13    Murray diagnosed:

14 | Axis I | Bipolar disorder, generalized anxiety, and depressive disorder not otherwise specified |

15
16 | Axis II | defer |

| Axis III | Allergic to erythromycin and related drugs; severe head tremors; undergoing tests for breast lumps; broken L4 vertebra; abuse by male partners |

18
19 | Axis IV | |

| Axis V | GAF current =41      Past (1 year)=42 |

AR 198.[14]

21
22 ///

23
24    [14]   The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations."  *Id*. at 34.  The first description in the range indicates symptom severity; the second, level of functioning.  *Id*. at 32.  In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings.  *Id*. at 33.

    GAF 41 and 42 are at the bottom of the range GAF 41-50, which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).  DSM IV TR at 34.

1  Murray found moderate impairments in the areas of community living, community

2  participation, community contribution, financial, and education and learning.  AR 198.  She found

3  that Plaintiff had severe impairments in the areas of relationships with others, physical and

4  emotional health, and legal.  AR 198.  Murray estimated that Plaintiff would need twelve months

5  of treatment.  AR 199.

6  On December 13, 2005, Plaintiff saw Sri, complaining that she had been depressed for one

7  month.  AR 255.  Sri prescribed Paxil.[15]  AR 255.

8  On December 22, 2005, Michael Mayer of College Community Services undertook a

9  psychiatric evaluation of Plaintiff, who complained of depression.  AR 192-194.  Initially, the

10  report set forth a brief history of relevant occurrences in Plaintiff's life.  A drug user since she was

11  13, Plaintiff had abused speed from 1992 until about 18 months earlier.  AR 192.  She had also

12  abused alcohol.  AR 193.  Plaintiff had attended drug rehabilitation from January 2004 to January

13  2005.  AR 192.  She had attempted suicide at age 19 by running out into traffic.  AR 192.  She had

14  recently regained custody of her three teen-aged children after living without them for seven years.

15  AR 192, 193. She was on probation for burglary.  AR 193. Her father had died of cancer in April

16  2005.  AR 192.

17  The report noted that Plaintiff's speech and psychomotor activity were normal, her thought

18  process was logical, and her mood and affect were depressed.  AR 193.  Plaintiff had fair

19  attention, insight, and judgment; her long term memory was intact, and her concentration was low.

20  AR 193.

21  Mayer diagnosed:

22  Axis I          major depression incident to alcohol and amphetamine abuse in complete
                    remission

23

24  Axis II         defer

25  Axis III        back problems, head tremor, and renal [Indecipherable]

26  Axis IV

27

28  ──────────

[15]  Paxil (paroxetine) is used to treat depression, panic disorder, social anxiety disorder, and obsessive-compulsive disorder, among others.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001037 (November 4, 2010).

Axis V          GAF current =55        Past (1 year)=70

AR 194.[16]

Mayer recommended the use of antidepressants and continued attendance at an Alcoholics Anonymous or Narcotics Anonymous group. AR 194. He also discussed with Plaintiff the benefits of exercise. AR 194.

On June 26, 2006, L.T. Luu applied the psychiatric review technique for the agency and concluded that Plaintiff's impairment was not severe. AR 304.

On November 29, 2006, psychiatrist Jagdeep Garewal, M.D., who treated Plaintiff twice monthly, completed a mental disorder questionnaire form. AR 320-330. Following rehabilitation, Plaintiff developed chronic depression, vegetative symptoms, paranoia, phobias and anxiety. AR 320. She was inattentive, with poor concentration and fair memory. AR 321, 323. Plaintiff was sensitive to noise. AR 322. She had mild social impairments, with panic attacks and problems in crowds. AR 323. Garewal diagnosed major depression, recurrent, with psychosis, co-morbid with anxiety, not otherwise specified. AR 324.

According to Garewal, Plaintiff's ability to follow work rules, relate to co-workers, deal with work stress, and maintain attention and concentration was poor. AR 326. Her ability to deal with the public, use judgment, interact with supervisors, and function independently was fair. AR 326. She had poor ability to make performance adjustments including understanding, remembering, and carrying out complex job descriptions, and understanding, remembering, and carrying out detailed, but not complex, complex job descriptions, and fair ability to understand, remember and carry out simple job descriptions. AR 328. Because of her depression and prior use of methamphetamine, Plaintiff had low short-term memory. AR 328. Her ability to maintain

///

---

[16] GAF 55 is the midpoint of the range GAF 51-60, which indicates "[[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*. at 34.

GAF 70 is in the top point of the range 61-70, which indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV TR at 34.

personal appearance, behave in an emotionally stable manner, and relate predictably in social situations was fair, but her ability to demonstrate reliability was poor. AR 328.

On January 12, 2007, Luu noted an affective disorder but reported insufficient evidence to substantiate it or any other mental condition. AR 332-345. Luu found that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. AR 340. Finally, Luu prepared a mental residual functional capacity assessment in which he found that Plaintiff had no significant limitations in any areas except for moderate limitation in her ability to understand, remember, and carry out detailed instructions. AR 343-344.

Garewal prepared a series of psychiatric progress notes for KCMH. On January 1, 2007, Plaintiff was feeling down and complaining of chest pains (apparently due to medication) and a need to get a cardiovascular work-up. AR 725-726. Current disability was mild to moderate. AR 726.

On January 31, 2007, Plaintiff announced that she was leaving her boyfriend and looking for a new place to live. AR 723. She was depressed, anxious, and angry. AR 723. Her current disability was mild to moderate. AR 724.

On February 4, 2007, Plaintiff reported that she had stopped taking Seroquel[17] two days earlier because it was too strong. AR 721. She was depressed, anxious, and angry but reported no panic attacks. AR 721. She complained that "All people are against me." AR 721. Plaintiff's disability was mild to moderate. AR 722. Garewal switched Plaintiff from Seroquel to Abilify.[18] AR 722.

///

---

[17] Seroquel (quetiapine) are prescribed to treat symptoms of schizophrenia and to prevent and control episodes of depression or mania in bipolar patients. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030 (November 4, 2010).

[18] Abilify (aripiprazole) is used to treat symptoms of schizophrenia, symptoms of mania in patients with bipolar disorder, and to treat depression when other antidepressants alone cannot control the patient's symptoms. www.ncbi.nlm.nih.gov/pubmedhealth/PMH00221 (November 4, 2010).

1    On March 7, 2007, Plaintiff, who had last worked in 2002, said she was unable to hold a

2    job. AR 719. She was mellow but grieving the past. AR 719. Plaintiff also complained of

3    hiccups. AR 719. She was depressed, anxious, and complained of panic attacks. AR 719.

4    Although she would continue to require treatment for over a year, her disability was mild. AR

5    720.

6    On May 2, 2007, Plaintiff complained that her medications made her sleepy, that she could

7    not handle stress, and that she felt depressed and anxious. AR 717. Nonetheless, Garewal

8    reported good compliance with medication and no side effects. AR 717. Plaintiff was less

9    depressed but was anxious, angry, and irritable. AR 717. She reported no panic attacks. AR 717.

10   Her sleep and appetite were excessive. AR 717. Plaintiff was neat, her speech was normal, and

11   her eye contact was good. AR 717. Behavior was cooperative and affect was appropriate. AR

12   717. Psychomotor symptoms were decreased, her mood was depressed and anxious, and her

13   affect was appropriate. AR 717. Insight, memory, and judgment were fair, but attention and

14   concentration were impaired. AR 717. In sum, Plaintiff's current disability was mild, although

15   she would continue to require treatment for more than a year. AR 718.

16   On July 11, 2007, Garewal reported on Plaintiff's medical condition and mental capacities

17   with regard to her ability to participate in a CalWORKS activity. AR 788-789. Garewal opined

18   that Plaintiff was unable to handle stress, depressed and anxious daily, unable to concentrate or

19   remember, experienced fatigue and low energy, and needed redirection for activities. AR 789.

20   Relevant to her social functioning was short temper, irritability, anger, panic attacks, and avoidant

21   behavior. AR 789. Her poor concentration and memory interfered with task completion. AR

22   789. According to her past history, close contact with others aggravated Plaintiff's symptoms.

23   AR 789. Her interactions with co-workers and supervisors was poor. AR 789.

24   On June 13, 2007, Garewal, who was then seeing Plaintiff for a half-hour appointment

25   twice each month,[19] completed a mental impairment questionnaire. He diagnosed:

26       Axis I          major depression, recurrent and anxiety not otherwise specified

27

28   _____

   [19] Garewal's treatment role appears solely to have been supervision of Plaintiff's medication. *See, e.g.,* AR
   727-728. Plaintiff appears to have received little "talk therapy."

1   Axis II          (defer)

2   Axis III         osteoporosis,GBP, tremors

3   Axis IV          mild

4   Axis V           GAF current =50       Past (1 year)=50

5   AR 712.[20]

6       Garewal reported that Plaintiff's signs and symptoms included poor memory, appetite

7   disturbance with weight change, sleep disturbance, mood disturbance, anhedonia or pervasive loss

8   of interest, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty

9   thinking or concentrating, social withdrawal or isolation, blunt, flat, or inappropriate affect,

10  decreased energy, and generalized persistent anxiety.  AR 712.  Garewal added that Plaintiff

11  "could not handle stress."  AR 712.  Although Plaintiff had received medication, psychotherapy,

12  and group therapy, she was chronically moderately depressed and moderately anxious.  AR 713.

13  Her medications produced drowsiness and fatigue as side effects.  AR 713.

14      Because her condition was chronic, Plaintiff's prognosis was guarded.  AR 713.  Her

15  chronic depression increased her perception of back pain.  AR 713.  She was likely to miss work

16  more than three times per month.  AR 714.  She had fair ability to remember work procedures; to

17  understand, remember, and carry out short and simple instructions; to ask simple questions or to

18  request assistance; to accept instruction and respond appropriately to criticism from supervisors;

19  and to respond appropriately to changes in a routine work schedule.  AR 714-715.  She had poor

20  ability or no ability to maintain attention for two hour segments; maintain regular work attendance

21  and be punctual; sustain an ordinary routine without special supervision; work in coordination

22  with or proximity to others without being unduly distracted; complete a normal workday without

23  interruption from psychologically based symptoms; perform at a consistent pace without an

24  unreasonable number and length of rest breaks; get along with co-workers or peers without unduly

25  distracting them or exhibiting behavioral extremes; deal with normal work stress; or be aware of

26

27      [20]  GAF 50 is at the top of the range GAF 41-50, which indicates "[s]erious symptoms (e.g., suicidal
    ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
28  school functioning (e.g. no friends, unable to keep a job).  DSM IV TR at 34.

1   normal hazards and take appropriate precautions.  AR 714-715.  Garewal attribute Plaintiff's

2   limitations to her becoming "too overwhelmed too fast," and to her anxiety and cognitive

3   problems.  AR 715.

4          In addition, Plaintiff's physical pain, and cognitive and vegetative symptoms of depression

5   left her with poor or no ability to understand and remember detailed instructions, carry out

6   detailed instructions, set realistic goals or make plans independently of others, and deal with the

7   stress of semiskilled or skilled work.  AR 715.  Finally, according to Garewal, Plaintiff had fair

8   ability to interact appropriately with the public, maintain socially appropriate behavior, adhere to

9   basic standards of neatness and cleanliness, travel in an unfamiliar place, or use public

10  transportation.  AR 715.  Accordingly, Garewal opined that Plaintiff had a slight restriction of

11  activities of daily living, moderate difficulties in maintaining social functioning, constant

12  deficiencies of concentration, persistence or pace, and repeated episodes of deterioration or

13  decompensation.  AR 716.

14         KCMH prepared a clinical reassessment on October 10, 2006.  AR 729-734.  Fighting

15  between Plaintiff and her boyfriend had escalated, and Plaintiff was thinking of leaving him.  AR

16  729, 730.  Her medications were Zoloft,[21] Xanax,[22] Vicodan, Soma,[23] and Trazadone.[24]  AR 729.

17  Plaintiff rated her depression as fluctuating between six and nine on a ten-point scale.  AR 729.

18  She experienced panic attacks when she went to bed and started worrying about everything.  AR

19  729. The reassessment notes that Plaintiff's depression is aggravated by her physical problems,

20  including her head tremor and broken vertebra.  AR 733.  Plaintiff had a gym membership, but

21  needed supplementary support to actually go there.  AR 733.

22  _____

23     [21]  Zoloft (sertraline) is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic

24  stress disorder, and social anxiety disorder.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017 (November 4, 2010).

25     [22]  Xanax (alprazolam) is used to treat anxiety disorders and panic attacks.
    www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000807 (November 4, 2010).

26     [23]  Soma (carisoprodol) is a muscle relaxant used to relax muscles and to decrease pain from muscle

27  injuries.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717 (November 4, 2010).

28     [24]  Trazadone is an antidepressant prescribed for depression, panic attacks, aggressive behavior,
    agoraphobia, and cocaine withdrawal.  www.medicinenet.com/trazadone/article.htm (November 4, 2010).

Plaintiff's diagnosis was:

| | |
|---|---|
| Axis I | Major Depression Disorder, Recurrent, Moderate<br>Anxiety Disorder Not Otherwise Specified<br>Amphetamine Dependence, Sustained Full Remission |
| Axis II | (defer) |
| Axis III | Chronic back pain; Non-Parkinson's Tremor; Allergic to Erythromycin |
| Axis IV | history of domestic violence; Currently in unstable relationship |
| Axis V | GAF current =45        Past (1 year)=45 |

AR 732.[25]

Following the assessment, Plaintiff entered into a new plan of care with KCMH, which set forth plans for Garewal to supervise medication bimonthly, for case manager Sarah Fechner to meet with plaintiff for thirty minutes monthly to provide encouragement and monitoring of Plaintiff's efforts to reduce depression, for Plaintiff to attend Fechner's anger management group weekly, and for Plaintiff to attend ten therapy session with Mary Bradley, LMFT, to learn skills and coping techniques to reduce depressed moods.  AR 727-728.

Plaintiff saw Garewal on February 13, 2008, complaining of jerky movements, off-and-on depression, and feelings of worthlessness and guilt.  AR 875.

Plaintiff saw Garewal on May 7, 2008, reporting that she was unable to get up to shower , had wishes of death, and impulsive and invasive thoughts.  AR 873.  She had discontinued Lamictal,[26] which produced a rash.  AR 873.  On a prescription blank, Garewal wrote, "Kelly has been under mental health [treatment] at this clinic since 12/22/05, she needs ongoing treatment to avoid severe worsening of her condition."  AR 881.

A psychiatric progress note prepared by Garewal on June 18, 2008, noted that Plaintiff experienced significant psychiatric problems every time she experienced physical problems.  AR

---

[25]  GAF 45 is at the midpoint of the range GAF 41-50, which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).  DSM IV TR at 34.

[26]  Lamictal (lamotrigine) is used to treat epileptic seizures and to increase the time periods between depressive and manic episodes in patients with bipolar disorder.  Severe rashes are a known side effect. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000957 (November 8, 2010).

871.  Plaintiff had discontinued Tegretol[27] after it made her shake, and was taking only Wellbutrin[28] and Abilify.  AR 871.  She had low energy and was depressed, anxious, angry, and irritable.  AR 871.  Garewal assessed Plaintiff's current disability as moderate but opined that she was unable to work.  AR 872.

Garewal prepared a medical report, dated June 25, 2008, in which he reported that Plaintiff was coping poorly, without energy, depressed, anxious, and fatigued.  AR 880.  With regard to social functioning, she was irritable, angry, had panic attacks, and avoided social interactions.  AR 880.  Her concentration was poor, and her memory was low.  AR 880.  She had poor interaction with co-workers and supervisors by history.  AR 880.

### 3.    Additional Information and Documents

**Daily Activities Questionnaire.**  In a daily activities questionnaire dated January 26, 2006, Plaintiff reported an inability to concentrate or remember.  AR 116.  Her head tremors limited her daily activities.  AR 116.  Although her doctor had directed her to walk a mile each day, because of her shortness of breath, Plaintiff had not met that goal in the three weeks following the doctor's recommendation.  AR 116.  Climbing stairs to buildings also left her short of breath.  AR 117.  Her weakness and back pain impeded her ability to complete her grocery shopping.  AR 117.  She was able to perform light housekeeping, delegating heavy and demanding jobs to her teen-aged children.  AR 117.  She rested twice a day for a period of one-half hour to three hours.  AR 118.  Plaintiff wore a brace for her back and took Trazadone, Paxil, Naprosyn,[29] Mysoline, and Robaxin.[30]  AR 118.

---

[27] Tegretol (carbamazepine) is used to control certain types of seizures, to treat facial nerve pain, and to treat symptoms of mania in bipolar patients.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000620 (November 4, 2010).

[28] Wellbutrin (bupropion) is used to treat symptoms of depression, seasonal affective disorder, and smoking cessation.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000970 (November 4, 2010).

[29] Naprosyn (naproxen) is an anti-inflammatory pain reliever used to relieve pain, tenderness, swelling and stiffening caused by arthritis, bursitis, tendinitis, and other forms of pain.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526 (November 4, 2010).

[30] Robaxin (methocarbamol) is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000718 (November 4, 2010).

16

**Adult Function Report.**  In an adult function report dated January 28, 2006, Plaintiff complained of lack of motivation, poor organization, poor memory, anxiety, depression, and insomnia.  AR 120, 121.  She cared for teen-ager children and pets, and prepared family meals. AR 121, 122.  Before she was disabled, she could care for the disabled, clean her house, drive long distances, and stand in long lines.  AR 121.  She had time to socialize.  AR 121.  She was able to stand longer to cook or wash dishes.  AR 122.   Although she still did laundry, taking it from the dryer to her room left her breathless.  AR 122.  Completing tasks now took longer and was painful.  AR 122.  She did her own grocery shopping, but tired easily.  AR 123.  Now, her social life centered on her church.  AR 124.  She no longer had time for fun.  AR 124.

Plaintiff's condition affected her ability to lift, squat, bend, stand, reach, walk, sit, hear, remember, concentrate, and follow instructions.  AR 125.  In particular, her head tremors impaired concentration and memory.  AR 125.  In response to the question regarding unusual behavior or fears, Plaintiff noted, "I fear I'm turning into a fat nothing."  AR 126.  Her physical condition caused her to cry and get angry.  AR 127.

**Third-Party Adult Function Report.**  Claiming she had no other friends or relatives able to complete the form,[31] Plaintiff submitted a third-party report from her boyfriend's teen-aged son, Michael Catalfamo, dated January 30, 2006.  AR 130.  Catalfamo's report was consistent with the one that Plaintiff completed.  He reported that the teen-agers who lived with Plaintiff did most of the housework and that Plaintiff was easily depressed and frustrated.  AR 131, 134.

### 4.    Residual Functional Capacity (RFC)

J. Passgual, M.D., and Lee evaluated Plaintiff's physical capacities on September 1. 2005. AR 302-303.  Using a check-off form, the doctors reported that Plaintiff could stand or walk for two hours or less at one time for a total of two to four hours a day.  AR 302.  Plaintiff could sit for two to four hours at one time for a total of two to four hours a day.  AR 302.  She had no restrictions in using her hands or feet for repetitive motions. AR 302.  The doctors checked that Plaintiff was restricted by environmental factors but failed to explain the nature of such

---

[31]  Nonetheless, on other forms, Plaintiff consistently listed her mother, Rebecca Garcia, as the person who was familiar with her condition and could be called to help with Plaintiff's claim.

restriction(s).  AR 302.  Plaintiff could carry 10 to 15 pounds frequently; 20-30 pounds occasionally; but could never carry forty pounds or more.  AR 303.  Plaintiff could frequently balance and reach below her knees; occasionally climb, crawl, and reach chest to shoulders or above her shoulders; and could never stoop, kneel, crouch, or each waist to knees or waist to chest.  AR 303.  Finally, Plaintiff's ongoing treatment could affect her ability to work, but the doctors did not explain how.  AR 303.

**Disability Report–Appeal.**  In an undated update apparently prepared some time after April 2007 in preparation for her upcoming hearing. Plaintiff reported that her spinal deterioration and mental health issues were much worse.  AR 143.  Her panic attacks had intensified, and she was afraid to go out.  AR 143, 146.  She was unmotivated to do personal grooming and had no energy.  AR 146.  She had severe pain, which caused anxiety. AR 146.  Her back and hips were slowly disintegrating.  AR 155.  She had been referred to a neurosurgeon.  AR 149.  Her medications included Abilify, Albuterol,[32] Robaxin, Vicodin, Zoloft, Demerol, Atrovent,[33] Flovent Inhaler,[34] Calcium Carbonate, [35]Primidone, Naproxen, Pravachol,[36] and Wellbutrin.  AR 145, 150, 152, 153, 154.

## 5.   Administrative Hearing

**Plaintiff's testimony.**  Plaintiff last worked in 2005, providing in home care services.  AR 887.  She had done that work, which included housekeeping, shopping, and physical care of

---

[32]  Albuterol is a bronchodialator used to prevent and treat wheezing, difficulty breathing, and chest tightness caused by lung diseases.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000355 (November 4, 2010).

[33]  Atrovent (ipratropium oral inhalation) is used to prevent wheezing, difficulty breathing, chest tightness, and coughing in persons with chronic obstructive pulmonary disease (COPD).  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000965 (November 4, 2010).

[34]  Flovent (fluticasone) is a corticosteroid that makes breathing easier by reducing swelling and inflammation of the airways.  www.medicinenet.com/fluticasone-oral_aerosol_inhaler/article.htm (November 4, 2010).

[35]  Calcium carbonate is a dietary supplement needed by the body for healthy bones, muscles, nervous system, and heart.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000035 (November 4, 2010).

[36]  Pravachol is used together with lifestyle changes (diet, weight loss, exercise) to reduce the amount of cholesterol and other fatty substances in the blood.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH000908 (November 4, 2010).

1 disabled persons, for ten years, off and on.  AR 887.  Her heaviest client weighed 250 pounds.

2 AR 888.  She had also worked as a telemarketer and an inventory control clerk.  AR 888.  Plaintiff

3 reported that she stopped providing home care services after injuring her back in February 2005.

4 AR 889.  She explained, "I went to Tehachapi and they said they found something that could be

5 from old trauma.  And they told me I could've re-fractured it or something.  And then it never

6 healed right."  AR 889.

7      As a result, Plaintiff experiences a lot of pain in her lower and middle back and upper

8 spine.  AR 889.  The pain is always there, although it gets better and worse.  AR 889.  Plaintiff's

9 head tremors developed two or three months after her back injury.  AR 890.  Her shaking head

10 embarrasses her and gives her headaches.  AR 890.  The medication does not control the shaking

11 so she spends as much time as possible lying down.  AR 890.  Plaintiff has a TENS unit[37] to

12 relieve pain.  AR 898-899.  She has little energy.  AR 891.

13      Plaintiff also experiences depression.  AR 892.  She described how it affected her:

14      Well, I have a lot of crying episodes, obviously.  My body aches.  I'm tired.  I get
       panic – I get – I don't like people.  I don't mean to sound mean, but I think people
15     are absolutely ridiculous.  Just the things they do is dumb.

16                                        * * * * *

17      Yeah, because I don't like people.  If I know the person, even, it sometimes – it's
       like I didn't carry my purse today, okay, because I don't want anybody going
18     through my purse.  It's like people just – they – they're always coming at me.
       They're always, you know, hey, she's a nice girl, but she's almost [inaudible], let's
19     get her.  You know?

20      AR 892.

21      Plaintiff claimed problems with memory and concentration.  AR 893.  She was unable to

22 handle stress, including her head tremors, grocery shopping, crowds, people.  AR 893.  If a store

23 was too crowded, she had to leave.  AR 894.  She sleeps poorly.  AR 894.  Plaintiff is awake for

24 less than ten hours a day and lies down for about five of those hours.  AR 899.  Plaintiff opined

25 that she would be unable to work full time, saying:

26

27      [37] "'TENS' is the acronym for transcutaneous electrical nerve stimulation.  A 'TENS unit' is a pocket size,
       portable, battery operated device that sends electrical impulses to certain parts of the body to block pain signals."
28     www.arthritis.about.com/od/assistivedevicesgadgets/tensunit.htm (November 4, 2010).

1    Well, one thing, I can't remember somebody's name five minutes after we meet,
     let alone somebody telling me how to do stuff.  The other thing I have a problem
2    with, people yelling at me, or just, you know, I just attack back, obviously.  Or I get
     so shut in.  It's like when I feel that people are–I've had problems with people
3    trying to help me.

4    AR 894.

5    Plaintiff lived with her daughter and two roommates.  AR 895.  She cooked and drove her

6    own car.  AR 895.  She attended church on Sundays and Wednesdays.  AR 895.

7    Plaintiff estimated that she could be on her feet for 15 or twenty minutes.  AR 897.  In an

8    eight-hour day, she could probably stand for a total of an hour.  AR 897-898.  She could sit for

9    two hours at a time and for two hours of an eight-hour day.  AR 898.  She could lift five to ten

10   pounds.  AR 898.

11   **Vocational Expert Testimony.**  Alan Cummings testified as vocational expert.  For the

12   first hypothetical, the ALJ asked:

13         Okay.  I don't believe any of her work is substantial, gainful activity.  So for
           purposes of the claimant's entry work, assume the claimant, 41 years old, with a
14         twelfth grade education capable of performing medium work with mild pain.  And
           that would include the ability to stand or walk six hours out of eight hours, sit six
15         hours out of eight hours.  Would be mildly limited for understanding and
           remembering tasks for sustained concentration and persistence, for socially
16         interacting with the generally [*sic*] public and adapting to workplace changes.  And
           using a regressive mental limitation scale, slight to mild to moderate to marked.
17         Would there be entry work she could perform and if so, what would the jobs be?

18   AR 900.

19   Cummings testified that at the medium level, SVP 2, Plaintiff could work as a janitor

20   (22,000 jobs in Los Angeles County; two million nationally); or packager (5000 jobs in Los

21   Angeles County; 200,000 jobs nationally).  AR 900.  At the light level, SVP 2, Plaintiff could

22   work as an inspector (7000 jobs in Los Angeles County; 295,000 jobs nationally), an assembler

23   (21,000 jobs in Los Angeles County; 700,000 jobs nationally), or a packager (5000 jobs in Los

24   Angeles County; 200,000 jobs nationally).[38]  AR 900-901.  An individual with the mental

25   limitations that the ALJ described could not perform any of those jobs with continuity, however.

26   AR 901.

27

28
          [38]  Cummings testified that packager jobs are available at both the light and the medium level.  AR 901.

1    Plaintiff's attorney then asked Cummings whether a person could perform those jobs if

2 they had limitations following work rules, relating to co-workers, dealing with work stress,

3 maintaining attention and concentration, understanding, remembering and carrying out detailed or

4 complex job instructions, dealing with the public, using judgment, interacting with supervisors,

5 functioning independently, understanding, remembering and carrying out simple job instructions,

6 maintaining personal experience, behaving in an emotionally stable manner, and relating

7 predictably in social situations.  Cummings responded that, if the limitations meant that they did

8 not have the capacity to perform their work from 20 to 33 percent of the time, they would be

9 unable to find full-time work.  AR 902.  Such a person could have the ability to perform unskilled

10 work, however.  AR 902.

11    In the attorney's second hypothetical, Cummings was asked whether a person could

12 perform any of the identified jobs if they were unable to handle stress due to daily depression and

13 anxiety, were unable to concentrate or remember, were fatigued, had low energy, had a short

14 temper, irritability and anger, had panic attacks causing her to avoid people and situations, could

15 not complete tasks because of poor concentration or memory, or had poor ability to work with

16 others, supervisors, or co-workers.  AR 903.  Cummings opined that such a person could not

17 perform the listed jobs, primarily due to their inability to attend and concentrate, to handle stress,

18 and to complete tasks, AR 904.

19    In his third hypothetical, Plaintiff's attorney asked Cummings whether a person could

20 perform the enumerated jobs if she was unable to maintain attention for two hours, maintain

21 regular attendance, be punctual within usual tolerances, sustain an ordinary routine without

22 special supervision, work in coordination with or prosy [*sic*] to others without being unduly

23 distracted, make simple, work-related decisions, complete a normal work day or work week

24 without psychologically based symptoms, perform at a consistent pace without an unreasonable

25 number and length of rest breaks, get along with coworkers or peers without unduly distracting

26 them or exhibiting behavior extremes, deal with normal work stress, be aware of normal hazards

27 and take appropriate precautions, understand and remember detailed instructions, carry out

28 detailed instructions, set realistic goals or make plans independently of others, deal with stress at

21

semi-skilled or skilled work.  AR 904.  Cummings opined that such a person could not sustain full-time work.  AR 904.

## II.   Discussion

### A.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 18, 2005.  AR 27.  Plaintiff had a severe impairment, degenerative lumbar disc disease, but not a mental impairment.  AR 27.  Her impairment did not meet or medically equal one of the listed

1  impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and

2  416.926).  AR 27.  Plaintiff had no past relevant work.  AR 29.  Plaintiff had the residual

3  functional capacity to perform the full range of medium work.  AR 27.  After considering

4  Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded

5  that jobs that Plaintiff could perform existed in the national economy in significant numbers.  AR

6  30.

7          **B.      Scope of Review**

8          Congress has provided a limited scope of judicial review of the Commissioner's decision

9  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

10 a court must determine whether substantial evidence supports the Commissioner's decision.  42

11 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

12 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

13 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

14 as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must

15 be considered, weighing both the evidence that supports and the evidence that detracts from the

16 Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

17 evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

18 *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

19 determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

20 the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

21 *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  The scope of review requires this Court to

22 consider the record as a whole, examining both the evidence supporting the ALJ's decision and

23 the evidence that does not.

24         Plaintiff contends that the ALJ made four errors that require this court to remand her case

25 to the agency for payment of benefits:

26         1.      The ALJ failed to properly evaluate the Plaintiff's subjective complaints and

27                 complaints of pain.

28 ///

23

1       2.      The ALJ erred in finding that the Plaintiff did not have a severe mental

2              impairment.

3       3.      The ALJ failed to properly determine Plaintiff's residual functional capacity.

4       4.      The ALJ posed an incomplete hypothetical question to the vocational expert.

5       **C.**     **Were Plaintiff's Pain Reports Credible?**

6       Accusing the ALJ of substituting his own medical opinion for the evidence in the record,

7 Plaintiff contends that the ALJ erred in questioning Plaintiff's credibility regarding her physical

8 complaints, including her pain and head tremor.  The agency responds that the ALJ acted correctly

9 since Plaintiff's testimony was inconsistent with the medical evidence and her own account of her

10 daily activities.

11       The ALJ found that Plaintiff's "medically determinable impairments could reasonably be

12 expected to produce the alleged symptoms, but that the claimant's statements concerning the

13 intensity, persistence and limiting effects of these symptoms are not entirely credible."  AR 28.

14 He added that Plaintiff's subjective complaints are not consistent with the treatment she receives.

15 AR 29.

16       An ALJ is not "required to believe every allegation of disabling pain" or other non-

17 exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

18 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony

19 after a medical impairment has been established, the ALJ must make specific findings assessing

20 the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and*

21 *Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is

22 not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834,

23 *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He

24 or she must set forth specific reasons for rejecting the claim, explaining why the testimony is

25 unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466

26 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the

27 court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.*

28 *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

1    When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

2  for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct,

3  claimant's daily activities, claimant's work record, and testimony from physicians and third

4  parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social*

5  *Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary

6  techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

7  statements concerning the symptoms, and other testimony by the claimant that appears less than

8  candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

9  prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533

10  F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the

11  ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

12  decision.  *Thomas*, 278 F.3d at 959.

13    For example, in addition to finding Mrs. Thomas's medical records did not support the

14  level of pain and the limitations to which she testified, the ALJ in *Thomas* found that Thomas had

15  an "extremely poor work history," "little propensity to work in her lifetime," and a sporadic work

16  history periodically interrupted by years of unemployment.  *Id.* Thomas, who had worked as a

17  bartender, house cleaner and concession worker, remained able to perform her own housework,

18  including cooking, laundry, washing dishes, and shopping.  *Id.* Her testimony about her drug and

19  alcohol usage was internally inconsistent and lacked candor.  *Id.* And, most compelling, Thomas

20  impeded testing during two physical capacity evaluations, demonstrating "self-limiting behavior"

21  that embodied inconsistent and minimal effort.  *Id.*

22    The Ninth Circuit has summarized the applicable standard:

23    [T]o discredit a claimant's testimony when a medical impairment has been
     established, the ALJ must provide "'specific cogent reasons for the disbelief.'"
24    *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The
     ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive."  *Id.*
25    Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a
     malingerer, those "reasons for rejecting the claimant's testimony must be clear and
26    convincing."  *Id.*  Social Security Administration rulings specify the proper bases
     for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's
27    testimony cannot be supported by reasons that do not comport with the agency's
     rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have
28    the same force and effect as the statute or regulations, they are binding on all

1   components of the Social Security Administration, . . . and are to be relied upon as
    precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th
2   Cir. 1998) (concluding the ALJ's decision at step three of the disability
    determination was contrary to agency rulings and therefore warranted remand).
3   Factors that an ALJ may consider in weighing a claimant's credibility include
    reputation for truthfulness, inconsistencies in testimony or between testimony and
4   conduct, daily activities, and "unexplained, or inadequately explained, failure to
    seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603;
5   *see also Thomas*, 278 F.3d at 958-59.

6   *Orn*, 495 F.3d at 635.

7       An ALJ may not disregard a claimant's testimony solely because objective medical

8   evidence does not fully substantiate it. *Robbins*, 466 F.3d at 883.  Unless the ALJ finds that

9   affirmative evidence demonstrates that the claimant is a malingerer, he or she can only find the

10  claimant's testimony not credible by making specific findings of credibility and supporting each

11  such finding with clear and convincing evidence. *Id.*

12      In this case, the ALJ addressed Plaintiff's reports and testimony thoughtfully and in detail:

13          The claimant's subjective complaints and alleged limitations are out of
            proportion to the objective clinical findings and observed functional restrictions as
14          noted above.  There is no evidence of severe disuse muscle atrophy that would be
            compatible with her alleged inactivity and inability to function since the alleged
15          onset date of February 2005.

16                                      * * * * *

17          The claimant's subjective complaints and alleged limitations are not
            consistent with the treatment she receives.  The claimant has routine follow up and
18          medication refills from her primary care physicians.  The record does not
            corroborate severe medication side effects from every medication available to her,
19          or contraindication to every treatment available to her.  The record does not show
            that the claimant has inpatient hospitalizations or significant emergency room
20          treatment.  The record does not show that the claimant attends treatment so
            frequently that it would require her to be absent from work for days at a time every
21          month.  It is reasonable to assume that, if the claimant were as disabled as she
            claims, her doctors would have ordered more aggressive treatment since the
22          claimant has access to medical treatment.

23          Despite allegations of total disability since February 2005, the claimant
            admitted to her mental health evaluator on October 2005 that she does volunteer
24          work at church and animal control and helps with Girl Scout troops and her son's
            young marine troop.  She also reported that she goes to the park, barbeques, feeds
25          the ducks, travels to Lancaster to visit with family and goes to the movies.  She is
            reported as regularly going to church and counseling, reading religious material
26          and paperbacks, manages her own bills and finances, drives a car, uses public
            transportation, goes out alone every day, cares for a pet, engages in household
27          chores, runs errands.  The claimant testified that she reads the Bible, is constantly
            going over her finances and dealing with creditors, does the laundry, cooks, drives
28  ///

                                        26

a car, goes to church, does volunteer work and other activities through her church family and is raising teenagers on her own as the dad lives elsewhere.

AR 28-29 (*internal citations to the record omitted*).

As discussed above, this Court must uphold the ALJ's determination that a claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez*, 812 F.2d at 510. Although Plaintiff is unhappy with the outcome of her application, a review of the file as a whole unquestionably establishes that the ALJ's conclusions were supported by substantial evidence. Her doctor's treatment notes amply reported that, although Plaintiff had some mild spinal degeneration, her back was normal but for the pain of muscle strain. Nonetheless, Plaintiff repeatedly and incorrectly insisted that she had fractured her back. Although Plaintiff's back strain required frequent doctor's visits in 2005, the record reveals only one visit for back pain in 2006.

After Plaintiff received physical therapy between December 2006 and April 2007, she reported that her lower back was "feeling good." On April 13, 2007, her therapist discharged her, noting, "No functional limitations," and directed Plaintiff to continue home management of her back. Subsequent x-rays revealed her spine to be normal. Plaintiff reported difficulty climbing stairs, carrying laundry baskets, and walking the daily mile as her doctor directed her to do, but because physical effort left her breathless, not because of back pain. The ALJ did not err in concluding that Plaintiff was not disabled by back pain.

In this context, the Court must note that the ALJ did err in concluding that Plaintiff was severely impaired by degenerative lumbar disc disease. Substantial evidence in the record does not support the ALJ's conclusion. To the contrary, analyses of Plaintiff's numerous x-rays, MRI, and CT scans repeatedly indicated that, at most, Plaintiff had very minimal disc degeneration. Plaintiff spine evinced a single anomaly, limbus vertebra, that is, slight additional boney tissue between L3 and L4, resulting either during Plaintiff's development or from an earlier trauma. Plaintiff's physicians repeatedly opined that her limbus vertebra had no functional effect.

Substantial evidence supported that Plaintiff's back pain resulted from muscle strain that was not disabling. The record documents numerous directions by her treating physicians to walk

27

and to exercise.  After Plaintiff received physical therapy, she reported that her lower back felt good.  Her therapist noted that the chronic back pain was gone and Plaintiff had no functional limitations.  Plaintiff was instructed on beneficial exercises and directed to continue performing them at home.  Although the record does not specifically note whether or not Plaintiff continued to exercise as instructed, she reported to mental health professionals that she was unmotivated to use the gym to which she had a membership.

This Court agrees with the ALJ that Plaintiff's complaints of pain were not credible.  Substantial credible evidence did not even support the ALJ's finding at step 2 that Plaintiff had a serious degenerative lumbar disc disease.

**D.     Did the ALJ Err in Failing to Adopt Garewal's Opinion the Plaintiff Was Disabled by her Emotional Problems?**

Plaintiff contends that the ALJ erred in failing to find that she suffered a severe mental impairment "despite evidence to the contrary."  She maintains that the ALJ failed to give due weight to the opinion of her treating physician, Dr. Garewal.[39]  Her contention is incorrect since the ALJ carefully considered Garewal's treatment notes and evaluation before concluding that any mental disability affecting Plaintiff was not severe.

"The existence of a emotional disorder . . . is not per se disabling."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  A claimant must also prove the ailment's disabling severity.  *Id.* at 642-43.  The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).  Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those

///

---

[39]  Because this Court concludes that no substantial credible evidence supported the ALJ's finding that Plaintiff was severely impaired by degenerative lumbar disc disease, no basis remains for the agency's contention that any severe mental impairment was subsumed within the Plaintiff's severe physical impairment.

who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.

A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

This Court's task is not to re-weigh the evidence but to determine whether the ALJ's determination is supported by substantial evidence and free of legal error. The Court must review the ALJ's express reason(s) for declining to adopt a doctor's opinion and determine whether the rejection was specific and legitimate.

Although an ALJ need not discuss every piece of evidence, he or she must consider the combined effect of all of the claimant's impairments, including those that are not, by themselves, of sufficient severity to establish a disability *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). The ALJ may only consider limitations or restrictions attributable to medically determinable impairments, not those attributable to other factors such as body build, age, or prior experience. S.S.R. 96-8p at *2 (June 2, 1996). For example, the ALJ need not consider Plaintiff's contention that her felony record impaired her ability to secure a job.

In this case, the ALJ carefully considered treatment records from KCMH and Plaintiff's psychiatrist, Dr. Garewal, noting, in particular, the discontinuity between Plaintiff's reported activities and the treating professionals' ratings of Plaintiff on the Global Assessment of Functioning (GAF) scale.

> Dr. Garewal's opinion is essentially a recordation of the claimant's subjective complaints, as he did not describe that he assessed the various mental functions such as concentration, attention, memory, etc. He does not state in the actual treatment records that he finds more than mild or moderate symptoms, and his assessment of the claimant's functional assessments secondary to those symptoms in the same treatment records are not noted as more than mild. The longitudinal record from the primary care physician does not show that the claimant is non-

29

functional and psychotic as Dr. Garewal claimed on the disability form.  None of the evaluating doctors have reported on the effect of the claimant's continued alcohol usage on her level of depression.  Thus, I find the assessment even allowing for moderate limitations inconsistent with the treating record, with the fact that the claimant is raising teenagers on her own, and given her admitted activities of daily living.  The claimant would not and could not raise children if she was as psychotic as reported.

AR 26.

Substantial evidence supports the ALJ's decision.  Plaintiff herself initially applied for disability benefits based on her physical disability, not her emotional state.  According to Garewal, despite other difficulties attributable to her long-term drug addiction, Plaintiff had fair ability to interact appropriately with the public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in an unfamiliar place, or use public transportation.  Plaintiff's recovery from long-term substance abuse had some not-surprising emotional repercussions as Plaintiff grieved lost time and opportunities, and recommenced social relationships, having broken with old friends who were bad influences.  But, having overcome her addiction, Plaintiff had regained custody of her children, cared for them along with the children of her boyfriend until she ended her relationship with the boyfriend, kept house, drove her own car, and participated in church activities.  The ALJ had the opportunity to witness Plaintiff's testimony and observe her ability to function during the hearing.  His decision being supported by substantial credible evidence, this Court will not second-guess it.

### E.  Residual Functional Capacity and Examination of Vocational Expert

Because no substantial credible evidence established that Plaintiff had any severe impairment, the analysis of her claims should not have proceeded beyond step two.  Accordingly, this opinion does not reach Plaintiff's claims relating the residual functional capacity and examination of the vocational expert.

## III.  Conclusion and Order

Based on the foregoing, the Court finds that substantial credible evidence was insufficient to support a finding that Plaintiff was severely impaired in any way.  Accordingly, this Court

///

///

DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.



IT IS SO ORDERED.


Dated:   November 23, 2010                          /s/ Sandra M. Snyder
                                        UNITED STATES MAGISTRATE JUDGE